Toby Lynn WILLIAMS, Appellant,

v.

The STATE of Texas, Appellee.

No. 69582.

Court of Criminal Appeals of Texas,
En Banc.

June 22, 1988.

Rehearing Granted Sept. 21, 1988.

Rehearing Denied April 12, 1989.

**526**

Bill Warren, Center, for appellant.

John S. Walker, Dist. Atty., and Robert A. Goodwin, Asst. Dist. Atty., Center, Robert Huttash, State's Atty., Austin, for state.

## OPINION

ONION, Presiding Judge.

This is an appeal from a conviction for capital murder. V.T.C.A., Penal Code, § 19.03(a)(2). Following affirmative jury findings to the special issues submitted pursuant to Article 37.071(b)(1) and (2), V.A.C.C.P., the court assessed punishment at death.

Appellant originally raised six points of error, but subsequently waived his first two including a complaint about the change of venue from Panola County to Collin County.[1] As appellant, inter alia, challenges the sufficiency of the evidence to support the affirmative finding to Special Issue No. One the facts will be briefly set out before responding to the points of error.

Appellant was convicted of murdering Debra Gail Moore while in the course of kidnapping or attempting to kidnap her. The testimony of the witnesses at the guilt/innocence stage of the trial revealed the following facts concerning this offense. At around 9:30 or 10:00 p.m. on the night of December 19, 1984, Victoria Hinton and Wilma Franklin left Hinton's home to go for a walk in their hometown of Greenwood, Louisiana, a town about 15 miles from the Texas border. The purpose of their walk was to get some cigarettes, but during their walk they encountered Toby Lynn Williams, the appellant in this case. As the two women approached a bridge near Hinton's house they came upon appellant squatting down near the street, holding a .357 magnum pistol. Appellant asked the two women, with whom he was acquainted, whether "they wanted to make a couple of thousand dollars" by robbing a

---

1. In oral argument before this Court appellant's counsel waived the first two points of error and the court duly noted the same. Appellant also filed a written motion waiving the point of error involving the change of venue acknowledging that the change of venue had been by agreement. Said motion was granted.

man at his house on Rice Road, which was nearby.

The three of them agreed to carry out the robbery, but first they decided to go to the house of a friend of Hinton's, Joe Joe Sims, to get some cigarettes. While at this friend's house they smoked marihuana, and talked, and finally went to the store for some beer and cigarettes in the car of another friend who had driven by, Odis Lindsey. They made their purchases, and after sitting in the car smoking marihuana and listening to music, Hinton, Franklin, and appellant left the car walking with Sims. Sims soon left the three of them and walked back to his own house. The planned robbery was not discussed by the three of them in the presence of their other friends.

After Sims left them, Hinton, Franklin, and appellant walked to the house on Rice Road. It was approximately 11:30 p.m. when appellant knocked on the door while holding the pistol under his jacket. Johnny Moore came around from a side entrance after turning on the outside lights. Moore asked how he could help the appellant. Appellant then pulled his gun and told Moore to get inside the house and turn off the outside lights. Appellant made Moore go back into his bedroom, where his wife, Debra Gail Moore, and their six month old child were. Appellant demanded to know where Moore's money and jewelry were located, but Moore only had about eleven dollars in cash with him. Appellant then asked if Moore had any guns and proceeded to collect Moore's shotgun, 30–30, and 22 rifle, which the two women thereafter kept trained on the Moores.

Appellant then asked Moore if he had money in the bank, and demanded his automatic teller machine card to get access to the funds. Moore told him how to use it to withdraw the one hundred and ten dollars which was in his savings account. Appellant took the keys to Moore's car and left to remove the funds from the account at an automatic teller machine, leaving Hinton and Franklin to guard the Moores. While appellant was gone, Hinton and Franklin alternately collected items of personal property from around the house and put them in pillow cases, while the other stood guard. Appellant was unable to get any money from Moore's account by using the automatic teller card. Appellant and the two women proceeded to load goods from the house into the truck, including a stereo and a console television, which appellant made Moore help him load. During this time Johnny Moore determined that appellant was Toby Lynn Williams, a former employee of his.

Upon his return from attempting to get the money from Moore's account, appellant told Hinton that they would have to kill Johnny and Debra Gail Moore because they would be witnesses in a police investigation. After appellant, Hinton, and Franklin loaded up the truck with goods, appellant told the Moores to get dressed because they had to go with him to "take care of some business." It was then around 2:30 a.m. on the morning of December 20, 1984. With Hinton and Franklin in the front seat, and Hinton holding the .357 magnum pistol on the Moores, who were in the back seat, appellant drove out to a relatively deserted road just across the border inside the Texas state line, some 15 miles from the Moores' house. Appellant then told the Moores to get out of the car and give their six-month-old son to Franklin. When Mrs. Moore refused to give up her child, Franklin slapped her to try to make her obey. Mrs. Moore finally relinquished the child to her husband, who handed the baby over to Franklin.

Franklin and Hinton returned to the car with the baby while appellant made Johnny and Debra Gail Moore walk down the road from the car. Appellant then told them to take off their clothes and "make love" to each other standing up. When the couple was unable to do so, appellant ordered them to lie down on the street and have intercourse. Again, the Moores were not able to comply. While they knelt in the street facing each other, hugging and crying, wearing only their undergarments, appellant raised the 30–30 and shot Debra Gail Moore through the middle of her back. The bullet exited her body immediately below her bra, and entered Johnny Moore's

body. The Moores then fell to the ground immediately adjacent to one another.

Appellant proceeded to move Johnny Moore into a ditch on the side of the road which was filled with weeds. He then tried to do the same with Debra Gail Moore, but was unable to do so, apparently because her weight was too great. Upon returning to the car, appellant said that they would have to shoot Moore again because he was not going to die from the wound which he had sustained. Hinton suggested that Moore would indeed die from the wound without shooting him again. Appellant then got in the car, pulled up to where the bodies were and shined the car headlights on each of them. The three then drove off with the baby in the car. Appellant pulled over at a house on the side of the road and left the baby on the porch of the house.

Appellant, Hinton, and Franklin then returned to the neighborhood in which they and the Moores lived. They abandoned the car in some woods located near Hinton's house, and ran through the woods. Although they had planned to go back to the Moore's house to get the truck which they had loaded with goods, they decided not to do so when they heard sirens close by. Instead, appellant, Hinton, and Franklin ran back to Hinton's trailer home where they hid until the police came to investigate. Meanwhile, at the scene, Johnny Moore managed to get up out of the ditch and walk to a house to obtain help. Moore was able to tell the police the name of his assailant. While Johnny Moore was gone to get help, his wife, Debra Gail Moore died as a result of the gunshot wound inflicted on her by appellant.

In his third point of error appellant contends the "trial court fundamentally erred in allowing the State to strike peremptorily the only remaining Black venireperson, as it systematically excluded a distinct qualified group and created a conviction prone jury."

■ Appellant's 1985 trial occurred before the April 30, 1986 decision of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Appellant, a Black man, asserts in his brief that there were 140 persons summoned for jury duty in his case, and that only two of the group were Blacks. Prospective juror L.M. Jackson was successfully challenged for cause by the State without objection. The other black prospective juror, David G. Bell, was eliminated from the jury panel by a State peremptory challenge. There was no trial objection, no post verdict motions nor was the matter made an issue in the trial court at all. The *Batson* error is raised for the first time on appeal. Thus, we are confronted with the question we reserved in *Henry v. State*, 729 S.W.2d 732 (Tex.Cr. App.1987), in footnote #3 at 736—that is whether *Batson* error may be raised for the first time on appeal in a case that was pending on appeal at the time of the *Batson* decision. Further, it does not appear that the United States Supreme Court has written on the question.

In *Batson*, supra, the Court wrote:

"Accordingly, the component of the jury selection process at issue here, the State's privilege to strike individual jurors through peremptory challenges, is subject to the commands of the Equal Protection Clause. Although a prosecutor ordinarily is entitled to exercise permitted peremptory challenges 'for any reason at all, as long as that reason is related to his view concerning the outcome,' of the case to be tried, *United States v. Robinson*, 421 F.Supp. 467, 473 ([D.C.]Conn.1976), mandamus granted sub. nom. *United States v. Newman*, 549 F.2d 240 (CA.1977), 'the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant.'"

*Batson* ruled that a state criminal defendant could establish a prima facie case of racial discrimination violative of the Fourteenth Amendment, based on the prosecution's use of peremptory challenges to strike members of the defendant's race from the jury venire, and that, once the defendant had made a prima facie showing, the burden shifted to the prosecution to

come forward with a neutral explanation for those challenges.

Addressing retroactivity, the Supreme Court held in *Allen v. Hardy,* 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986), a federal habeas corpus proceeding, that *Batson* was not available to defendants whose direct appeals were final at the time *Batson* was announced. Subsequently, in *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), the Court held that *Batson* did apply to defendants whose appeals had not become final by the time of the *Batson* decision. Since appellant's appeal is still pending, his case falls within the *Griffith* ambit, the question we must answer is whether he should be permitted to raise the *Batson* issue initially on appeal.

In consideration of whether a *Batson* issue may be raised for the first time on appeal in those cases within the ambit of *Griffith* it should be observed that the *Batson* holding of a requirement of a racially neutral explanation from the prosecution was triggered by a timely objection in the trial court. Allen and Griffith also made timely objections in the trial court although *Batson* had not yet been decided. *Allen,* 478 U.S. at 256–57, 106 S.Ct. at 2879, 92 L.Ed.2d at 203; *Griffith,* 479 U.S. 318–19, 107 S.Ct. 710, 711, 93 L.Ed.2d at 654–655. The same was true in *Brown v. United States,* 107 S.Ct. at 711 (companion case to *Griffith*).

In *Henry v. State,* 729 S.W.2d 732, 736 (Tex.Cr.App.1987), this Court wrote:

"In its brief, the State argues that the *Batson* protections should not apply to appellant because he did not object before the jury was sworn. We find nothing in the Supreme Court opinions which requires that, in cases pending on review or not yet final at the time the *Batson* case was decided, the defendant object before the jury was sworn. Rather, *the opinions suggest at most that the defen-*

*dant present the issue to the trial court.*"[2] *(Emphasis supplied.)*

In *Keeton v. State,* 724 S.W.2d 58, 64 (Tex.Cr.App.1987); *Henry,* supra; *De Blanc v. State,* 732 S.W.2d 640 (Tex.Cr.App.1987); *Robinson v. State,* 738 S.W.2d 673 (Tex.Cr.App.1987); *Chambers v. State,* 742 S.W.2d 695 (Tex.Cr.App.1988); *Tompkins v. State,* 774 S.W.2d 195 (Tex.Cr.App.1987); *Williams v. State,* 731 S.W.2d 563, 564 (Tex.Cr.App.1987),[3] all pre-*Batson* cases, this Court found a timely trial objection or found that the *Batson* issue was timely raised in the trial court sufficient to preserve any *Batson* error.

In the instant case the State urges that the appellant did not object and the *Batson* error, if any, was not preserved for appeal. Appellant does not refer to any objection and urges in his point of error that the trial court "fundamentally erred." It is well settled in this State that in the ordinary case the failure to make a specific, timely objection at trial will waive error on appeal. See *Guzmon v. State,* 697 S.W.2d 404 (Tex.Cr.App.1985), cert. denied 475 U.S. 1090, 106 S.Ct. 1479, 89 L.Ed.2d 734; *White v. State,* 629 S.W.2d 701 (Tex.Cr.App.1981), cert. denied 456 U.S. 938, 102 S.Ct. 1995, 72 L.Ed.2d 457; *Von Byrd v. State,* 569 S.W.2d 883 (Tex.Cr.App.1978), cert. denied 441 U.S. 967, 99 S.Ct. 2418, 60 L.Ed.2d 1073; *Hovila v. State,* 562 S.W.2d 243 (Tex.Cr.App.1978), cert. denied 439 U.S. 1135, 99 S.Ct. 1058, 59 L.Ed.2d 97. This is no less true when the error is one of constitutional dimension. See *Porter v. State,* 623 S.W.2d 374 (Tex.Cr.App.1981), cert. denied 456 U.S. 965, 102 S.Ct. 2046, 72 L.Ed.2d 491; *Burks v. State,* 583 S.W.2d 389 (Tex.Cr.App.1979), cert. denied 448 U.S. 907, 100 S.Ct. 3050, 65 L.Ed.2d 1136; *Moulden v. State,* 576 S.W.2d 817 (Tex.Cr.App.1978).

It has been held that the failure to object to the constitutionally improper exclusion of a venireman waives that right and that

---

**2.** It was in *Henry* that the question presented today was reserved.

**3.** *Williams* was originally affirmed in 682 S.W.2d 538 (Tex.Cr.App.1984). It was pending review in the United States Supreme Court

when *Batson* was decided. The judgment of this Court was vacated and the cause remanded by the Supreme Court for further consideration in light of *Griffith.*

such exclusion cannot be considered on appeal. *Modden v. State,* 721 S.W.2d 859, 862 (Tex.Cr.App.1986); *Hawkins v. State,* 660 S.W.2d 65 (Tex.Cr.App.1983); *Burks v. State,* 583 S.W.2d 389 (Tex.Cr.App.1979).

In *Ex parte Chambers,* 688 S.W.2d 483, 486 (Tex.Cr.App.1984), cert. den. 474 U.S. 864, 106 S.Ct. 181, 88 L.Ed.2d 150, Judge Campbell, in a concurring opinion, joined by four other judges, held that since 1972 this Court has recognized that a failure of counsel to object does not constitute a waiver where a defect of constitutional magnitude has not been established at the time of the trial. *Chambers* cited *Ex parte Taylor,* 484 S.W.2d 748 (Tex.Cr.App.1972); *Ex parte Sanders,* 588 S.W.2d 383 (Tex.Cr.App.1979); *Ex parte Casarez,* 508 S.W.2d 620 (Tex.Cr.App.1974); *Boulware v. State,* 542 S.W.2d 677 (Tex.Cr.App.1976); *Cuevas v. State,* 641 S.W.2d 558 (Tex.Cr.App.1982).

The broadly stated rule, which began, as the concurring opinion in *Chambers,* supra (688 S.W.2d at 486), would have it with *Taylor,*[4] is not without exception. See *Crawford v. State,* 617 S.W.2d 925, 939 (Tex.Cr.App.1981) (opinion on rehearing); *Cuevas,* supra 641 S.W.2d at 563.

The rule established assumes the retroactivity of the constitutional holding involved, and we do not interpret the rule as excus-

ing a defendant for his failure to object where the invocation of the new constitutional right could have been reasonably anticipated.

Appellant urges fundamental error on the part of the trial judge. He does not discuss his failure to object. He does not urge the futility of objection or show or suggest cause for the procedural default.[5] He does not even contend that *Batson* is a new constitutional right nor request a remand for a *Batson* type evidentiary hearing.

In *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982), the Supreme Court held that on federal habeas corpus review, the futility of a state defendant raising an objection before the state courts cannot constitute "cause" under *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

In *Engle v. Isaac,* supra, Justice O'Conner, for the majority, stated:

"... the futility of presenting an objection to the state courts cannot alone constitute cause for a failure to object at trial. If a defendant perceives a constitutional claim and believes it may find favor in the federal courts, he may not bypass the state courts simply because

---

**4.** *Taylor,* supra, was the first case cited in *Chambers,* supra. It involved a post-conviction habeas proceeding under Article 11.07, V.A.C.C.P. Taylor had been convicted in 1961 of possession of a narcotic drug, dolophine, and his punishment was assessed at life imprisonment as a result of allegation and proof of two prior felony convictions under Article 63, V.A.P.C. (1925). It was Taylor's contention in 1972 that his 1961 state conviction was void because his prior 1951 federal conviction for acquiring marihuana without having paid the federal Marihuana Transfer Tax used to enhance his punishment to life imprisonment was invalid in light of *Leary v. United States,* 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969).

*Leary* held that the privilege against self-incrimination was a complete defense to a prosecution under 26 U.S.C., § 4744(a)(2). Taylor, of course, had not objected on this basis at the time of his 1951 federal conviction obtained by a guilty plea or at the time of his 1961 state trial when the federal conviction was used for enhancement. His first complaint came at the time of his post-conviction state habeas application. This Court first struggled with the retroac-

tivity of *Leary,* and after deciding on retroactive application we were confronted with the question of waiver of the defense when Taylor entered a guilty plea. We concluded, however, that in 1951 and 1961 he did not know nor could have reasonably expected to anticipate that invocation of the self-incrimination defense would bar his federal conviction and punishment. Taylor's 1961 state conviction by a jury was set aside. Much water has passed under the bridge since *Taylor,* and we do not pause here to sort out whether exactly the same result would have been reached today. Cf. *Hill v. State,* 633 S.W.2d 520 (Tex.Cr.App.1982); Article 44.29, V.A.C.C.P.

**5.** It has been held in the past that *mere* alleged use of peremptory challenges to strike qualified Blacks is not a prohibited systematic exclusion of Blacks in the selection of petit jurors. *Ridley v. State,* 475 S.W.2d 769, 772 (Tex.Cr.App.1972); *Chambers v. State,* 568 S.W.2d 313, 328 (Tex.Cr.App.1978); *Evans v. State,* 622 S.W.2d 866, 868, 869 (Tex.Cr.App.1981); *McKay v. State,* 707 S.W.2d 23 (Tex.Cr.App.1985), cert. den. 479 U.S. 871, 107 S.Ct. 239, 93 L.Ed.2d 164.

he thinks they will be unsympathetic to the claim. Even a state court that has previously rejected a constitutional argument may decide, upon reflection, that the contention is valid. Allowing criminal defendants to deprive the state courts of this opportunity would contradict the principles supporting *Sykes.*"

The Court specifically left open the question of whether the novelty of a constitutional claim would ever establish "cause." *Engle,* supra, at 130, 102 S.Ct. at 1573.

The question left open in *Engle* was answered in *Reed v. Ross,* 468 U.S. 1, 104 S.Ct. 2901, 2910–11, 82 L.Ed.2d 1 (1984). In *Reed,* the Court established that, as far as exercise of federal habeas jurisdiction by a federal court reviewing a state criminal conviction, "cause" is established when novelty of a constitutional right could not reasonably have been known by competent counsel at the time of the trial. The *Reed* court specifically held "that where a constitutionality claim is *so novel* that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures." 104 S.Ct. at 2910 (emphasis added).

With this background we now review decisions from other jurisdictions.

In *State v. Holder,* 155 Ariz. 83, 745 P.2d 141, 143–144 (1987), the Court was confronted with a question similar to the one in the instant case. There the Arizona Supreme Court wrote:

"RETROACTIVITY AND FAILURE TO OBJECT AT TRIAL

"The question of whether a constitutional principle is 'retroactive' is a question distinct from the question of whether a defendant must timely assert the principle in order to receive its benefits. While the Supreme Court has twice considered the retroactivity of *Batson,* it has not considered whether a defendant may successfully raise a *Batson* issue for the first time on appeal. Addressing retroactivity, the Court held in *Allen v. Hardy,* 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986), that *Batson* was not available to defendants whose direct appeals were final at the time *Batson* was announced. In *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), the Court held, again addressing the issue of retroactivity, that *Batson* applied to defendants whose appeals had not become final by the time of the *Batson* decision. When the instant case was being briefed in the court of appeals, *Griffith* had not yet been decided, and the state urged in its brief that *Batson* should not be applied retroactively. The court of appeals correctly noted that the retroactivity issue was settled by *Griffith.* Since the defendant here falls within the *Griffith* ambit, the question then becomes whether he should be permitted to raise the *Batson* issue for the first time on appeal. The court of appeals held that he could do so. We disagree.

"Absent fundamental error, error is usually considered to be waived on appeal unless it was objected to at trial. *State v. Henley,* 141 Ariz. 465, 687 P.2d 1220 (1984). This principle also applies to constitutional error. See *State v. Magallanes,* 110 Ariz. 235, 517 P.2d 505 (1973). Only fundamental error, that is, error which goes to the very foundation of the case, may be raised for the first time on appeal. *State v. Burton,* 144 Ariz. 248, 697 P.2d 331 (1985).

In considering whether a *Batson* issue may be raised for the first time on appeal, we note first that the ruling in *Batson* itself was that the requirement of a racially neutral explanation from the prosecutor was triggered by a timely objection in the trial court. The defendants in both *Allen* and *Griffith* had also made timely objections, although the *Batson* case had not yet been decided. *Allen,* 478 U.S. at 256–57, 106 S.Ct. at 2879, 92 L.Ed.2d at 203; *Griffith,* 479 U.S. at 316, 318, 107 S.Ct. at 710, 711, 93 L.Ed.2d at 654–655.

"While the Court has not directly addressed the issue of *Batson* as fundamental error, in discussing the retroactivity issue, the Court in *Allen* stated:

"Significantly, the new [*Batson*] rule joins other procedures that protect a

defendant's interest in a neutral fact-finder. Those other mechanisms existed prior to our decision in *Batson,* creating a high probability that the individual jurors seated in a particular case were free from bias. Accordingly, *we cannot say that the new rule has such a fundamental impact on the integrity of fact-finding as to compel retroactive application.*

478 U.S. at 259–60, 106 S.Ct. at 2881, 92 L.Ed.2d at 205 (emphasis added).

"At least one federal circuit court has noted this passage and held that a *Batson* challenge does not involve fundamental error and is waived if a timely objection is not made. *Virgin Islands v. Forte,* 806 F.2d 73, 76–77 (3d Cir.1986). See also *United States v. Erwin,* 793 F.2d 656, 667 (5th Cir.1986). In addition, several state appellate courts have held that a *Batson* challenge must be made in a timely fashion or it is waived. *Ford v. State,* 180 Ga.App. 807, 350 S.E.2d 816 (1986); *People v. Holder,* 153 Ill.App.3d 884, 106 Ill.Dec. 700, 506 N.E.2d 407 (1987); *Weekly v. State,* 496 N.E.2d 29 (Ind.1986). We conclude that a *Batson* issue does not present fundamental error and a failure to raise it cannot be excused on that ground.

"However, our holding that fundamental error is not involved does not end our inquiry. The court of appeals did not hold that the *Batson* issue presented fundamental error. Instead, it held that the defendant's failure to raise the issue in the trial court could be excused under the 'novelty' doctrine of *Reed v. Ross,* 468 U.S. 1, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984). In *Reed,* the Supreme Court considered whether, for federal habeas corpus purposes, there had been excusable cause for failure of a defendant to raise a constitutional claim in his state court appeal. The Court stated:

[We] hold that where a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures.

468 U.S. at 16, 104 S.Ct. at 2910, 82 L.Ed.2d at 15.

"Whether *Reed* is applicable at all in our situation is questionable since, in *Reed,* the Court was considering a federal habeas corpus standing issue and was dealing with a constitutional principle which, unlike *Batson,* had been held to be fully retroactive. However, even assuming that a *Reed* analysis is appropriate here, we find that the issue under consideration fails the novelty test of *Reed.* The record in this case shows that, throughout the trial court proceedings, the defendant claimed to be concerned about the racial composition of the jury. Nevertheless, he made no objection or record which would have permitted the trial, the court of appeals or this court to address the issue or correct the problem if one was found. The lack of a *Batson* decision on the books did not prevent Batson, Allen or Griffith from timely raising the issue in their trials. To us, it would be anomalous indeed to hold that the defendant in this case can invoke *Batson* although he never raised it at his trial, while Allen, who anticipated *Batson* and did raise it at his trial, cannot.

"Further, on the novelty issue, it is appropriate to note that some state courts have been applying *Batson*-like decisions for a number of years. *See, e.g., People v. Wheeler,* 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978); *State v. Neil,* 457 So.2d 481 (Fla.1984); *Commonwealth v. Soares,* 377 Mass. 461, 387 N.E.2d 499 (1979). Indeed, prior to the trial in this case and prior to *Batson,* a member of this court had indicated in a published concurrence that Arizona should adopt a rule similar to *Batson. State v. Wiley,* 144 Ariz. 525, 698 P.2d 1244 (1985) (Feldman, J., specially concurring). That same concurring opinion also pointed out that, in the prescient view of the writer, the question presented was an open one and was not foreclosed by *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) (holding that in order to prove a violation of the equal protection clause of

the fourteenth amendment, a defendant must show that black jurors had been systematically excluded from juries over a long period of time).

"We do not deny that *Batson* is a significant change in the law. It is not, however, so novel an idea as to excuse the defendant's failure to make a timely objection. Had he done so, the record may have provided the information necessary to resolve the issue. As it is, we have no record at all, other than the defendant's after-the-fact unsworn contentions. The lack of a record is in itself a compelling argument for requiring the defendant to object in a timely fashion if he believed the jury was being improperly selected. Had he objected, the facts could easily have been determined by the trial court or a proper record could have been made for appellate review. Permitting such an issue to be injected belatedly on appeal places an intolerable burden on the trial court, the appellate court, and the parties. Therefore, we hold that appellant's failure to raise the issue at the trial court level is not excused."

Likewise, the same question was presented in *Commonwealth v. Johnson*, 368 Pa. Super. 427, 534 A.2d 511 (1987), where the Superior Court of Pennsylvania wrote:

"In *Swain v. Alabama*, 380 U.S. 202, 203–204, 85 S.Ct. 824, 826, 13 L.Ed.2d 759, 763 (1965), the United States Supreme Court first recognized that a 'State's purposeful or deliberate denial to Negroes on account of race of participation as jurors in the administration of justice violates the Equal Protection Clause.' In order to prove such a violation, however, the Court required that a defendant prove the establishment of a pattern by which the prosecution, in numerous cases, had peremptorily stricken veniremen of a particular race. *Id.* at 222–226, 85 S.Ct. at 837–839, 13 L.Ed.2d at 773–776.

"In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court reaffirmed the principle announced in *Swain* but reexamined the evidentiary burden placed on a defendant who wishes to challenge the government's use of peremptory challenges as racially discriminatory. In *Batson*, the Supreme Court relaxed the evidentiary burden on a defendant by holding that a prima facie case of purposeful discrimination can be established solely by facts pertaining to the defendant's trial. *Id.* at 94–99, 106 S.Ct. at 1722–1724, 90 L.Ed.2d at 87–88.

"In *Commonwealth v. McCormick*, 359 Pa.Super. 461, 519 A.2d 442 (1986), a panel of this Court held that *Batson* was to be applied retroactively to cases pending on direct appeal at the time *Batson* was decided. In *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), the United States Supreme Court also addressed the retroactivity of *Batson* and held that is ruling in *Batson* was to be applied, as a matter of federal constitutional law, to all cases, state or federal, which were pending on direct appeal or not yet final.

"In the instant case, appellant, who is black, was tried and found guilty on January 22, 1986. No objection was made during the selection of the jury that the Commonwealth was exercising its peremptory challenges in a racially discriminatory manner. Similarly, the issue was not raised in defendant's initial post-verdict motions. While those post-verdict motions were pending, the Supreme Court of the United States, on April 30, 1986, rendered its decision in *Batson*. On May 20, 1986, appellant filed an addendum to his post-verdict motions, in which he claimed for the first time that the Commonwealth had exercised its peremptory challenges in a racially discriminatory manner. The trial court found that appellant's claim had been waived by his failure to object to the Commonwealth's peremptory challenges at the time when the jury was being selected. Appellant now argues that he is entitled to an evidentiary hearing to explore the possibility that the Commonwealth's peremptory challenges were exercised improperly.

"Although appellant's case had not become final at the time when *Batson* was

decided, appellant's failure to preserve his objection to the manner in which the Commonwealth exercised its peremptory challenges precludes later review.

"The question as to whether we should foreclose an issue because of the absence of a timely objection is not one of retroactivity but rather one of issue preservation. These are two mutually exclusive concepts. The determination of the retroactivity of a principle goes to the question of whether that principle is at issue in the case; i.e., its applicability to the trial in question. *The question of issue preservation assumes the applicability of the principle but precludes consideration of that question because of procedural defects in the raising of the claim.* The failure to interpose an objection is clearly the type of factor which raises a question of issue preservation and it is not one of the concerns relevant in a determination as to the appropriateness of retroactive application.

*Commonwealth v. Hill,* 492 Pa. 100, 105, 422 A.2d 491, 494 (1980) (Opinion in Support of Affirmance) (footnotes omitted) (emphasis added). In short, the failure to raise an issue, objection, or argument in a timely manner during trial forecloses further review of an alleged error in post-trial motions or at the appellate level. See: *Commonwealth v. Horsey,* 481 Pa. 470, 393 A.2d 1 (1978); *Commonwealth v. Pritchitt,* 468 Pa. 10, 359 A.2d 786 (1976); *Commonwealth v. Riley,* 462 Pa. 190, 340 A.2d 427 (1975); *Commonwealth v. Clair,* supra [458 Pa. 418, 326 A.2d 272 (1974) ].

"The Supreme Court's decision in *Batson v. Kentucky, supra,* did not announce a new constitutional right. That right had been established in 1965 by the Supreme Court's decision in *Swain v. Alabama,* supra. The Supreme Court's decision in *Batson* merely relaxed the evidentiary burden on a defendant who claimed that the government's peremptory challenges had been exercised in a racially discriminatory manner; it did not alter the right which had originally been recognized in *Swain.* Thus, when the jury was selected for appellant's trial, he could have interposed a proper and viable objection to the manner in which the Commonwealth was exercising its peremptory challenges. Because he failed to object, his claim that the exercise of the Commonwealth's peremptory challenges was racially discriminatory has been waived. Such waiver is not obviated by the retroactive application of *Batson.* Cf. *Commonwealth v. McCormick, supra* 359 Pa.Super. at 476, 519 A.2d at 450 (retroactive application of *Batson* limited to cases where the objection to Commonwealth's use of peremptory challenges has been properly preserved)."

For other cases in accord see *People v. Holder,* 153 Ill.App.3d 884, 106 Ill.Dec. 700, 506 N.E.2d 407 (1987); *Ford v. State,* 180 Ga.App. 807, 350 S.E.2d 816 (1986); *Weekly v. State,* 496 N.E.2d 29 (Ind.1986); *United States v. Erwin,* 793 F.2d 656, 667 (5th Cir.1986), cert. den. 479 U.S. 991, 107 S.Ct. 589, 93 L.Ed.2d 590 (1986); *Virgin Islands v. Forte,* 806 F.2d 73, 76–77 (3d Cir.1986). See also *United States v. Ratcliff,* 806 F.2d 1253, 1256 (5th Cir.1986).

Appellant in the instant case has not shown the establishment of a new constitutional right as cause for failure to raise his claim earlier, for, as the Supreme Court noted of the claim advanced in *Smith v. Murray,* "Various forms of the claim he now advances [had] been percolating in the lower courts for years at the time of his original appeal." 477 U.S. 527, 535–36, 106 S.Ct. 2661 at 2667, 91 L.Ed.2d 434 at 446. See *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

While *Batson* made a significant change in the law it did not establish a new constitutional right. It merely relaxed the evidentiary burden on a defendant who claimed the prosecution's peremptory challenges had been exercised in a racially discriminatory manner. It did not alter the right recognized in *Swain.* See *Commonwealth v. Johnson,* supra. The issue was not so novel as to provide cause for appellant's procedural default in not objecting nor can it be said that he could not have

reasonably anticipated the invocation of the change made by *Batson*. By failing to object or raise the issue in any manner in the trial court appellant did not preserve any *Batson* error. He waived it.

■ It must be remembered that appellant's point of error is that the trial judge fundamentally erred in allowing the prosecution to strike peremptorily the only remaining Black venireperson as it systematically excluded a distinct qualified group and created a conviction prone jury.

While appellant does not stress it, it appears his contention is that the trial judge should have sua sponte intervened to prevent the State from exercising a peremptory challenge given it by law, Articles 35.14 and 35.15, V.A.C.C.P., in light of *Batson*, a decision reached after appellant's trial. It is insufficient that the prosecution merely challenged prospective jurors whose race is the same as that of the defendant. The defendant "must raise an inference that the prosecutor used the practice to exclude the veniremen from the petit jury on account of the their race." *Batson*, supra, 476 U.S. at 96, 106 S.Ct. at 1722–1723, 90 L.Ed.2d at 87. See also *United States v. Ratcliff*, 806 F.2d 1253, 1256 (5th Cir.1986).

Justice White in his concurring opinion in *Batson* noted:

"The Court emphasizes that using peremptory challenges to strike blacks does not end the inquiry; it is not unconstitutional without more, to strike one or more blacks from the jury. The judge may not require the prosecutor to respond at all."

In *State v. Holder*, supra, the Arizona Supreme Court in vacating a portion of the judgment of the Court of Appeals wrote:

"The court of appeals noted that the defendant here is black and that he claims that two members of his race were stricken from the jury by the state. From this alone, the court concluded that a prima facie case of prosecutorial discrimination had been established. Under *Batson*, the totality of the circumstances of the particular case must be examined to determine whether an inference of misconduct by the state has been established. In some instances, striking two members of a defendant's race, particularly if they are the only two, may be enough to support a finding of prima facie discrimination. However, we do not read *Batson* as requiring such a finding every time two members of a minority are stricken from a jury being selected to try a member of the same minority."

We cannot agree under the circumstances presented that the trial judge fundamentally erred in not sua sponte intervening to prevent the State's use of a peremptory challenge of the prospective juror.

Appellant's third point of error is overruled.

In his fourth point of error appellant contends the "trial court erred by denying appellant's challenge for cause and request for an additional peremptory challenge when the prospective juror could not seriously consider the full range of punishment, resulting in an abuse of discretion.

The prospective juror was John Yeager, who, after the challenge for cause had been overruled, became the twelfth juror in the case. Appellant contends that Yeager was disqualified under Article 35.16(c)(2), V.A. C.C.P.,[6] because he could not consider five years as punishment for murder, that he (appellant) had exhausted his peremptory challenges and that when the court overruled his challenge for cause he was forced to accept Yeager on the jury and that Yeager was an "objectionable" juror because the court refused to grant an additional peremptory challenge. In this manner he contends he has preserved the error for review. See *Hernandez v. State*, 563 S.W.2d 947 (Tex.Cr.App.1978), citing *Wolfe v. State*, 147 Tex.Cr.R. 62, 178 S.W.2d 274, 281 (App.1944) (opinion on rehearing). See

---

**6.** Article 35.16(c)(2) provides that a defendant may make a challenge for cause to a venireman if:

"he has a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely, either as a defense to some phase of the offense for which the defendant is being prosecuted or as a mitigation thereof *or of the punishment therefor.* (Emphasis supplied.)

also *Barefoot v. State,* 596 S.W.2d 875 (Tex.Cr.App.1980), cert. den. 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996.

In *Mathis v. State,* 576 S.W.2d 835, 836–837 (Tex.Cr.App.1979), this Court stated:

"Bias against the range of punishment is a proper area for both challenges for cause and peremptory challenges. When the contention is that the trial court erred in denying a challenge for cause, no reversible error is shown unless the defendant exhausted his peremptory challenges and one or more objectionable juror sat on the jury...."

 In reviewing the ruling of a trial court on a challenge for cause based on the bias of the venireman, the decision of the trial court will not be disturbed absent an abuse of discretion. See *Anderson v. State,* 633 S.W.2d 851, 854 (Tex.Cr.App. 1982). When, however, a prospective juror is shown to be biased as a *matter of law, he must* be excused when challenged, even if he states he can set aside his bias and provide a fair trial. *Anderson,* supra, at 854; *Clark v. State,* 717 S.W.2d 910, 917 (Tex.Cr.App.1986); *Cordova v. State,* 733 S.W.2d 175, 182 (Tex.Cr.App.1987). Where a venireman cannot consider the minimum five year sentence as a possible punishment for the lesser included offense of murder in a capital murder prosecution, that venireman is as a matter of law biased against a phase of the law upon which both the State and the defendant are entitled to rely. See *Nethery v. State,* 692 S.W.2d 686 (Tex.Cr. App.1985), cert. denied 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931; *Bodde v. State,* 568 S.W.2d 344 (Tex.Cr.App.1978), cert. denied 440 U.S. 968, 99 S.Ct. 1520, 59 L.Ed.2d 784 (1979). Bias also is established where the venireman cannot consider probation for the lesser included murder offense. See *Holloway v. State,* 691 S.W.2d 608 (Tex.Cr.App.1984); *Barrow v. State,* 688 S.W.2d 860 (Tex.Cr.App.1985); *Von Byrd v. State,* 569 S.W.2d 883 (Tex.Cr.App.1978); cert. denied 441 U.S. 967, 99 S.Ct. 2418, 60 L.Ed.2d 1073.

 During the voir dire examination of Yeager by the prosecutor Yeager indicated that he could consider the full range of punishment for capital murder, life or death, based upon the facts of the individual case. He also stated that he could consider the full range of punishment for the lesser included offense of murder and reserve judgment as to the appropriate punishment until he had heard all the facts of the case. He even agreed that he could consider five years' probation for the lesser included offense of murder. Special issue numbers 1 and 2 under Article 37.071, were explained to the prospective juror and he indicated he had no problem with such issues and could hold the State to its burden of proof of beyond a reasonable doubt on the issues.

When asked by appellant's counsel about his views on life imprisonment and the death penalty Yeager answered:

"I don't think I personally favor either one of them. It would, each case I think would just have to be based on its own merits. I think there are probably cases either one of them would be appropriate for."

After counsel interrogated Yeager about the special issues and other propositions of law the record reflects the following:

"Q Based on your views, Mr. Yeager, your personal opinion, if you served on a murder case and found someone intentionally and knowingly caused the death of another person without provocation, without justification, without excuse, was not self defense, would you seriously consider five year sentence to be an appropriate punishment in this case?

"A I don't think so.

"Q What are your feelings about the application of the law of probation in felony cases?

"A Well, I am not really necessarily for it. I think probation has a place, but I don't necessarily think, I think it would just depend on the individual case involved."

After explaining probation to the prospective juror appellant asked if he would "honestly give serious consideration as a

possible punishment for that person a five year probation.

"A I think it would be a possibility.

"Q You think you would consider it?

"A Here again I would have to know more about the particular facts and I think I would have to hear a good bit of mitigation, but I think I could consider it. I would be open to what my, but what my decision would be I don't know....

"Q Bearing that in mind, you are saying that your views would not inhibit you form considering, accepting, even urging others to release on a five year probation someone that you had determined was guilty of murder?

"A Like I say, it would be possible. Not that I would, but I would consider it, but if I, also being truthful I am not saying what the probability of that would be. I would consider it."

Later Yeager told appellant he could serve fairly and impartially. When the State accepted the juror appellant challenged for cause because he "stated he would not seriously consider five year sentence as an appropriate punishment for the lesser included offense of murder and there was no rehabilitative questioning by the State."

Without allowing the State to respond, the court overruled the challenge for cause in light of the answers given regarding "five years probated which would be even less than that."

The appellant relies upon the "I don't think so" answer of Yeager without more. Bias as a matter of law was not established and in reviewing the trial court's ruling we must do so in light of *all* the answers given. *Faulder v. State*, 745 S.W.2d 327 (Tex.Cr.App.1987); *Cordova v. State*, supra; *Anderson v. State*, supra; *Mays v. State*, 726 S.W.2d 937, 950 (Tex.Cr.App. 1986).

We cannot conclude, in light of all the answers given, that the trial court abused its discretion in overruling the challenge for cause.

In his fifth point of error appellant contends the "jury's verdict on punishment is based on insufficient evidence in response to Special Issues 1 and 2, in that there is no evidence appellant is mentally capable of formulating a plan and following a course of action 'deliberately and with the reasonable expectation that death would result.' "

The entire argument advanced under this point of error relates only to Special Issue No. 1 under Article 37.071(b)(3), (1), V.A.C. C.P., and does not refer to Special Issue No. 2.

Appellant relies heavily upon the testimony of Dr. Cecilia Erlund, a Doctor of Education, who stated that she was a licensed professional counselor, and an educational diagnostician. She related she was not a psychologist. Dr. Erlund testified that in three and one-half hours she gave the appellant a Stanford Benet Intelligent Test and a Woodcock Johnson Psyche–Educational Battery Part II test of achievement. She concluded he had an I.Q. of 53 and mental age of six to eight years and eight months. Counsel argues this testimony offered at the penalty stage of trial showed appellant was slightly mentally retarded. The State rebutted this testimony with that of Dr. Louise Troth, a psychologist, with a Ph.D. degree, who was a Unit Director at Rusk State Hospital. She explained the difference between her profession and a doctor of education specializing in counseling is that the latter normally does not deal with the mentally ill, but usually assesses the educational means of individuals in public schools to determine learning disabilities or disabilities from other causes and determines if help can be provided by special education or remedial classes. She explained the Woodcock–Johnson test was used largely in educational settings. In her opinion a diagnosis of mental retardation could not be made from Stanford–Bennet and the Woodcock–Johnson tests alone.

Dr. Troth gave appellant a Weschler test and his I.Q. was reflected at 67; that in talking to him and observing his writings,

etc., she did not conclude that he was mentally retarded.

The jury at the penalty stage of the trial was presented with the conflicting testimony of the two witnesses. The jury was the trier of the facts, the judges of the credibility of the witnesses and the weight to be given their testimony. The jury can accept or reject any part of a witness' testimony. *Lafoon v. State*, 543 S.W.2d 617 (Tex.Cr. App.1976). Even if the evidence had proven conclusively that the appellant was slightly mentally retarded, that in and of itself would not preclude the jury from finding that the appellant acted deliberately or making an affirmative finding as to the issue of future dangerousness. See *Goodman v. State*, 701 S.W.2d 850, 866–867 (Tex.Cr.App.1985). While the defendant is allowed to present any mitigating evidence regarding his mental capacity to the jury for their consideration during the penalty stage of the trial, *Fierro v. State*, 706 S.W.2d 310 (Tex.Cr.App.1986); *Stewart v. State*, 686 S.W.2d 118 (Tex.Cr.App.1984), there is no requirement that the jury must consider such evidence as sufficient to establish a negative answer to special issues.

Further, the facts at the guilt stage of the trial were before the jury and these facts alone can often be sufficient to support the affirmative findings of the jury to the special issues in their verdict at the penalty stage of the trial. *Russell v. State*, 665 S.W.2d 771 (Tex.Cr.App.1983), cert. den. 465 U.S. 1073, 104 S.Ct. 1428, 79 L.Ed.2d 752; *Fierro v. State*, supra; *Carter v. State*, 717 S.W.2d 60 (Tex.Cr.App. 1986); cert. den. — U.S. —, 108 S.Ct. 467, 98 L.Ed.2d 407; *Drew v. State*, 743 S.W.2d 207 (Tex.Cr.App.1987).

Here the evidence shows that appellant planned the robbery of Moore at his home. He secured a gun and asked Wilma Franklin and Victoria Hinton to join his criminal venture, asking whether they would like to make $2,000.00. Their actions at the Moore house has already been detailed and showed appellant to be the ring leader. That he planned to kill the Moores is evidenced by the record. While armed he took them from their home to the scene of the crime, telling Hinton that they had to kill the Moores to prevent them from going to the police. After shooting both Johnny and Debra Gail Moore, he considered shooting them again but desisted only when Hinton suggested they would die from their wounds. It was only then that appellant left the scene. Debra Gail Moore did die from her wounds. The determination of deliberateness must be found from the totality of the circumstances. *Cannon v. State*, 691 S.W.2d 664, 677 (Tex.Cr.App. 1985).

Viewing the evidence in the light most favorable to the jury's finding as to Special Issue No. 1, we conclude that a rational trier of fact could have found appellant acted "deliberately" beyond a reasonable doubt.

■ Though appellant does not brief or argue that the evidence was insufficient to support the affirmative finding of the jury as to Special Issue No. 2, he does mention this in his stated point of error.

In addition to the facts of the case at the guilt stage of the trial the State introduced at the penalty stage of the trial evidence that appellant had shot a man from behind in an attempt to rob the man at a convenience store in April when appellant was 15 years of age. In addition the State introduced a note written by appellant to Wilma Franklin while he was incarcerated awaiting trial in which he admitted that when things go wrong for him the "first thing come to mind is kill, or don't stop until I see blood."

Considering the evidence in the light most favorable to the affirmative finding to the second special issue, see Article 37.-071(b)(2), V.A.C.C.P., we conclude that a rational trier of fact could have found beyond a reasonable doubt that there was a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society.

■ In his sixth point of error, appellant contends that the trial court erred in failing to sustain his objection to the admission of certain photographs of the body of the victim, Debra Gail Moore, labeled State's

exhibits 9, 10, 11, 11A, 11A–1, 11B and 11C. Appellant's trial objection was that the photographs were repetitious, were not relevant to any material fact in issue, and were designed solely to inflame the minds of the jury. Appellant now argues only that the photographs in question were offered solely to inflame the minds of the jury.

It is the general rule that where a verbal description of the body is admissible, then a photograph depicting the same also will be admissible. See *Burdine v. State,* 719 S.W.2d 309, 316 (Tex.Cr.App.1986), cert. den. 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987); *Brown v. State,* 696 S.W.2d 913 (Tex.Cr.App.1985); *Lewis v. State,* 676 S.W.2d 136 (Tex.Cr.App.1984); *Lopez v. State,* 630 S.W.2d 936, 939 (Tex. Cr.App.1982); *Martin v. State,* 475 S.W.2d 265 (Tex.Cr.App.1972). Moreover, an otherwise admissible photograph "is not rendered inadmissible merely because it is gruesome or might tend to arouse the passions of the jury, unless it is offered solely to inflame the minds of the jury. *Lopez,* supra at 939. Only when the probative value of the photograph is very slight, and the inflammatory nature of the photograph is very great, will there be an abuse of discretion in the admission of the photograph. See *Hall v. State,* 619 S.W.2d 156 (Tex.Cr.App.1980); *Haas v. State,* 498 S.W.2d 206 (Tex.Cr.App.1973).

In the case at bar, each of the photographs in question presents a different perspective of the victim's body as it was found at the scene of the crime. In response to appellant's trial objection to the admission of the photographs, the State argued that each of the photographs served a different probative function. The photographs were not offered simply to show the jury a picture of the victim's dead body. They also showed the location of the body on the road where appellant committed the murder, corroborating the testimony of several State witnesses. In addition, the photos showed different perspectives of the bullet wound, supporting the State's case that Debra Gail Moore was shot from behind. Each of these matters was testified to by witnesses for the State; nevertheless, each of the admitted photographs

clearly were of probative value to the State's case against appellant. Thus, we cannot say that the decision by the trial court to admit the photographs into evidence constitutes an abuse of discretion. We overrule appellant's sixth point of error.

The judgment is affirmed.

CLINTON, J., disagrees with the treatment of point of error three, but concurs in the result.

MILLER, CAMPBELL, and DUNCAN, JJ., dissent as to the disposition of point of error No. 3.

TEAGUE, Judge, dissenting.

Until the dust recently settled, see *post,* the law of this State, per this Court, and of these United States, per the United States Supreme Court, was that a black defendant could not establish a violation of the Federal Constitution solely on proof of the prosecutor's use of peremptory challenges to strike black jurors at the defendant's own trial, for which there was a presumption that he did not do so for discriminatory purposes, but could raise the inference of same where it was shown that the prosecutor had engaged in a pattern of challenging black jurors in a series of cases. See *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). My research to date reveals that the scorecards, from the defendants' perspectives, closely resemble the number of points, 0, that the 1888 Yale football team's opponents scored against the Eli's, who scored 688 points that year; the number of points, 0, the Washington Redskins managed to score against the Chicago Bears in their 1940 championship game; and the number of points, 0, that Cumberland University scored against Georgia Tech in 1916 which scored 222 points. I will not say, however, that there is no reported or unreported case that reflects that a defendant did not "win" under *Swain,* supra; I will only say that my research at this time has not yet revealed such a case. Hopefully, if any such cases exist, where the defendants won, under *Swain,* supra, someone who knows will

send me copies of them, so I can share them with my Brethren.

The majority opinion correctly states that before appellant's third point of error, whether "[t]he trial court erred in allowing the State to strike peremptorily the only remaining black venire person, as it systematically excluded a distinct qualified group and created a conviction prone jury", can be reviewed, it must first be decided whether appellant can raise this issue for the first time on appeal. The majority opinion holds that he cannot. Given the past history of this subject, and the odds that favored a defendant winning on this claim, I strongly disagree.

The majority opinion correctly points out that appellant did not complain in the trial court of the State's using one of its peremptory strikes on one of the two black prospective jurors and waited until he filed his appellate brief on April 17, 1987. The record reflects that the State's challenge for cause as to the other black venireperson was sustained. Thus, all blacks were eliminated from the jury panel.

It does not appear to be disputed that other than the fact that the black venireperson who was peremptorily struck by the State was black, the same race as appellant, as appellant asserts, "he fits perfectly the profile of a State, conviction prone juror, as is evidenced by his personal background and responses." (Page 8 of appellant's brief, which also refers the reader to vol. 25 at page 3011 of the statement of facts in support of his assertion.)

Appellant was tried in 1985. At that time, given what this Court had stated and held, and what the Supreme Court had done in this area of the law, see, for example, *Harris v. Texas,* 467 U.S. 1261, 104 S.Ct. 3556, 82 L.Ed.2d 858 (1984); *Williams v. Illinois,* 466 U.S. 981, 104 S.Ct. 2364, 80 L.Ed.2d 836 (1984); *Gilliard v. Mississippi,* 464 U.S. 867, 104 S.Ct. 40, 78 L.Ed.2d 179 (1983); and *McCray v. New York,* 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983), in which certiorari had been denied, had any defense attorney asserted that a defendant in a criminal trial

could establish a prima facie case of racial discrimination violative of the Fourteenth Amendment, based on the prosecutor's use of peremptory challenges to strike members of the defendant's race from the jury venire, and that, once the defendant had made the prima facie showing, the burden shifted to the prosecution to come forward with a neutral explanation for those challenges, he would have been laughed out of the courtroom, and made fun of in every bar and club in town where criminal defense attorneys gathered in the evening to discuss worldly events that had occurred that day.

Appellant's authority in support of his point of error is the Supreme Court's recent decision of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), which, figuratively speaking, came out of the blue, and affirmed what some brave criminal defense attorneys had been previously, albeit unsuccessfully, asserting in trial and appellate courts. However, *Batson,* supra, was not handed down until April 30, 1986. Appellant's trial occurred in 1985.

In *Allen v. Hardy,* 478 U.S. 255, 106 S.Ct. 2878, 98 L.Ed.2d 199 (1986), decided on June 30, 1986, the Supreme Court held that *Batson* did not apply to defendants whose appeals had become final on April 30, 1986. In *Allen,* supra, the Supreme Court stated that "[t]he rule in *Batson v. Kentucky* is an explicit and substantial break with prior precedent", by "announcing a new standard that significantly changes the burden of proof imposed on both defendant and prosecutor", and that "prosecutors, trial judges, and appellate courts throughout our state and federal systems justifiably relied on the standard of *Swain.*" 106 S.Ct. at 2880, 2881. Nevertheless, the Court held that "the reliance interest of law enforcement officials is 'compelling' and supports a decision that the new rule should not be retroactive." 106 S.Ct. 2881. The Court further stressed that "retroactive application of the *Batson* rule on collateral review of final convictions would seriously disrupt the administration of justice." 106 S.Ct. at 2881.

But in *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), which was handed down on January 13, 1987, the Supreme Court once again sent tremors throughout the criminal justice systems of the United States when it held that *Batson*, supra, was applicable to defendants whose appeals had not become final by April 30, 1986, when *Batson*, supra, was decided.

The majority opinion agrees that "Since appellant's appeal is still pending, his case falls within the *Griffith* ambit." (Page 529.) It then holds, erroneously in my view, that appellant should not be permitted to raise the *Batson* issue initially on appeal.

On page 529, the majority appears to place great emphasis on the fact that in cases where this Court has either remanded the cause for a hearing, or has considered appellant's "Batson" claim, that each defendant complained in the trial court. However, I point out that but for *Batson*, supra, and *Griffith*, supra, such would not have meant anything to this Court in cases that were then pending on appeal. This is clearly reflected in *Williams v. State*, 682 S.W.2d 538 (Tex.Cr. App.1984), which defendant is not the same Williams as here, where this Court did not mention, much less discuss, whether the defendant had complained in the trial court. There, in response to the defendant's "ground of error", this Court merely stated the following: "The mere exercise of peremptory challenges is not sufficient to sustain the ground of error; there is no showing of systematic exclusion. (Citations omitted.) The ground of error is overruled." (543). I must point out, however, that it was not until after the Supreme Court vacated this Court's judgment in *Williams*, supra, and remanded the cause to this Court "for further consideration in light of *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987)", see *Williams v. Texas*, 479 U.S. 1074, 107 S.Ct. 1266, 94 L.Ed.2d 128 (1987), that this Court chose to point out that the defendant Williams had complained in the trial court. See *Williams v. State*, 731 S.W.2d 563, 564 (Tex.Cr.App.1987). In fact, my careful reading of *Griffith v. Kentucky*, supra, has yet to reveal where the Supreme Court stated that before a defendant whose case was not final when *Batson*, supra, was decided, he must have first complained in the trial court. Again, given the law that was extant when appellant's trial occurred, other than *Swain*, supra, which was, for any black defendant, a no win proposition, what objection could appellant have uttered to the trial judge? To answer the question is to ask it because in 1985, when appellant's trial occurred, he did not know, nor could he have reasonably anticipated or have been expected to be prescient, that the Supreme Court would on April 30, 1986, state and hold what it did in *Batson*, supra.

A main flaw in the majority opinion is its reliance upon *Engle v. Isaac*, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982), see commencing on page 10 of its slip opinion. It is important to remember and understand that *Engle*, supra, concerned the issue of procedural default by a federal habeas corpus defendant, and did not concern the raising for the first time on appeal a claim such as "Batson" error, as occurred in this cause. Furthermore, *Engle*, supra, concerned whether the federal district court's findings were "clearly erroneous." Neither of those issues is implicated in this cause.

I find it rather interesting that in the Supreme Court's latest discussion of Federal Rule Civ.Proc. 52(a), and the "cause-and-prejudice" standard, see *Amadeo v. Zant*, 486 U.S. 214, 108 S.Ct. 1771, 100 L.Ed.2d 249 (May 31, 1988), *Engle*, supra, is not even mentioned, much less discussed therein.

To implicitly, if not expressly, hold, as the majority opinion does, that "Batson" error is not so novel an idea as to excuse the defendant's failure to make a timely objection, is to truly make like the ostrich and ignore what went on before *Batson*, supra, was decided. Dear reader: Don't you think it would be nice if the majority opinion, without using any hindsight whatsoever, would expressly state what proper objection appellant could have made that might have preserved for appellate review

the "Batson" error he now asserts occurred during his trial? Perhaps, without using any hindsight, it can be prescient and state a proper objection for us.

If the majority opinion is correct in what it states and holds concerning appellant's procedural default, then I vote to hold, as a matter of law, that appellant's trial counsel was ineffective for failure to be prescient in 1985 as, at least by the prescient majority of this Court, he knew or he should have known what the Supreme Court was going to do on April 30, 1986, when it handed down *Batson v. Kentucky*, supra.

The majority opinion, however, much like Sherman marching through Georgia back in Civil War times, trudges onward. It implicitly, if not expressly, next states and holds that merely because the State used a peremptory strike on the only black who was qualified to serve on the jury, and there were no more blacks on the panel, that a prima facie case may not be established.

For my part, I believe this Court should adopt the more sound rule which the Arkansas Supreme Court recently adopted in its case of *Mitchell v. State*, 295 Ark. 341, 750 S.W.2d 936 (Sup.Ct.1988), that "[W]here the use of a peremptory challenge results in exclusion from the jury of *all* members of the defendant's minority race, it is not necessary to show exclusion of more than one minority juror of the same race as the defendant to make a prima facie case of discriminatory use of a peremptory challenge, and thus to invoke the 'sensitive inquiry' of *Batson v. Kentucky*, supra." (My emphasis.) I so believe because of what the Supreme Court taught us in *Gray v. Mississippi*, 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987), and *Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976), which held that the improper excusal of one prospective juror in a death penalty case contaminates and pollutes, irreversibly, the entire proceeding.

For the above and foregoing reasons, I respectfully dissent to this Court's overruling appellant's third point of error. This,

however, does not mean that I join the remainder of the majority opinion, because I don't.

## OPINION ON APPELLANT'S MOTION FOR REHEARING

PER CURIAM.

We granted rehearing in this cause to reexamine our conclusion on original submission that appellant waived *Batson* error by failing to object in the trial court. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In his motion, appellant again requests this Court to allow him to raise *Batson* error for the first time on appeal.

For reasons given in *Mathews v. State*, 768 S.W.2d 731 (Tex.Cr.App.1989, decided this day), disposition of this point of error on original submission was correct. The ground for rehearing is overruled.

MILLER, J., dissents.

TEAGUE, Judge, dissenting.

Adhering to my views that I set out in the dissenting opinion that I filed on original submission, I respectfully dissent to the majority opinion's holding that Toby Lynn Williams, appellant, is precluded from raising the *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), issue for the first time on appeal because he failed to complain in the trial court when the jury that convicted him and answered the special issues in the affirmative, which assured him to be sentenced by the trial judge to a premature death, was selected. Also see the dissenting opinion that I filed in *Mathews v. State*, 768 S.W.2d 731 (Tex. Cr.App.1989) (On appellant's motion for rehearing). (delivered this date).

The majority opinion so holds notwithstanding the fact that at that time neither *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), nor its principle that a prosecuting attorney may not blatantly exercise his peremptory strikes on an individual because of his or her race was extant.

Notwithstanding that appellant's trial occurred prior to when *Batson* was decided, appellant was entitled to receive the benefits of *Batson v. Kentucky* because it was decided when his case was on appeal. See *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).